AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA
v.

CASE NUMBER: 07-MJ-4098

JAMAHL LEONARD
JASON MONTROY
DANIEL WOODWARD
MATTHEW FOX
MICHAEL BURTON
LEVAR FANIEL
CARL MARTINO
TERRY BUDA
NATHAN CANARY
TARA CUNNINGHAM
aka "Tara Dossantos"
FRANCISCO FRANCO
JAY WHITECROW
JAMES KNOX
CHRISTOPHER LICATA
STEVEN POLITOWSKI
JEFFREY RAYBURN,

Defendants.

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

From about February 2007 to present, in Monroe and Wayne Counties, in the Western District of New York, the Defendants, did knowingly and willfully possess with intent to distribute, and did distribute 100 or more kilograms of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) AND (b)(1)(B); and conspired to do the same in violation of Title 21, United States Code, Section 846; ~~and Title 21, United States Code, Section 843(b) (use of a telephone to facilitate drug trafficking);~~ (mwp) and defendants James KNOX and Jamahl LEONARD violated Title 18, United States Code, Section 1956(h) (money laundering).

I further state that I am a Special Agent in the Bureau of Alcohol, Tobacco and Firearms and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof: (✔) Yes ( ) No

William Reichard, Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

October 9, 2007 at Rochester, New York
Date City and State

Hon. Marian W. Payson
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

JAMAHL LEONARD
JASON MONTROY
DANIEL WOODWARD
MATTHEW FOX
MICHAEL BURTON
LEVAR FANIEL
CARL MARTINO
TERRY BUDA
NATHAN CANARY
TARA CUNNINGHAM
aka "Tara Dossantos"
FRANCISCO FRANCO
JAY WHITECROW
JAMES KNOX
CHRISTOPHER LICATA
STEVEN POLITOWSKI
JEFFREY RAYBURN

Defendants.

---

07-MJ-4098

**CRIMINAL COMPLAINT**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, WILLIAM REICHARD, being duly sworn, deposes and says:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and as such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, et seq. and Title 18,

United States Code, Section 2516(1).

2. I have been employed with the Drug Enforcement Administration (DEA) since August 2000. I have investigated controlled substances violations during that time. I am currently assigned to the DEA Rochester Resident Office. During the past seven years, I have participated in multiple drug investigations. Furthermore, I have been involved in the execution of over 100 state and/or federal search warrants involving narcotics trafficking. As a result of all of the above, I am thoroughly familiar with the manner in which narcotics and other controlled substances are obtained, packaged, distributed, sold, and used. Moreover, I am familiar with the coded language and jargon used by the individuals engaged in narcotics trafficking to reference various narcotics and controlled substances, as well as the ways in which illicit drug sellers and users attempt to disguise their conversations relating to their activity by the use of codes, cryptic phrases, abbreviated words and prearranged terminology.

3. This affidavit is submitted in support of a Criminal Complaint charging JAMAHL LEONARD, CHRISTOPHER LICATA, CARL MARTINO, JASON MONTROY, STEVEN POLITOWSKI, DANIEL WOODWARD, JAY WHITECROW, TERRY BUDA, MICHAEL BURTON, NATHAN CANARY, TARA CUNNINGHAM, AKA: Tara Dossantos, LEVAR FANIEL, MATTHEW FOX,

FRANCISCO FRANCO, JEFFREY RAYBURN, and JAMES KNOX, with violations of Title 21, United States Code, Sections 846 (conspiracy to possess with intent to distribute and to distribute 100 or more kilograms of marijuana, 841(a)(1) and (b)(1)(B)(possession with intent to distribute and distribution of 100 kilograms of marijuana); and charging KNOX and LEONARD with Title 18, United States Code, Sections 1956 (h) (money laundering).

4. I am presently involved in an investigation being conducted by Special Agents of the United States Drug Enforcement Administration (DEA) Rochester Resident Office, the New York State Police (NYSP), WAYNENET (Wayne County Narcotics Enforcement Team), and the Internal Revenue Service. All law enforcement participants within this investigation are hereinafter referred to in this affidavit as "agents". Additionally, throughout this affidavit, if a subject's last name is printed in capital letters, that subject is a defendant in the investigation.

5. The information in this affidavit is based upon my personal knowledge obtained through my participation in this investigation to include, but not limited to reviewing reports prepared by various police agencies, information received from other experienced narcotics investigators and law enforcement agents and officers, and my review of conversations that have been

intercepted pursuant to court-authorized wire surveillance. As a result of my participation, I am familiar with all aspects of this investigation. The conclusions drawn in this affidavit are based on my training and experience as well as on the advice of other experienced federal, state and local narcotics investigators.

6. I submit that there is probable cause to believe that the individuals discussed above have conspired with each other and with others to possess with intent to distribute and to distribute more than 100 kilograms or more of marijuana. These individuals have been identified by various means, including but not limited to personal knowledge and observations by officers on surveillance, subscriber information for telephones over which the individuals have been intercepted, Department of Motor Vehicle driver's license and automobile registration records, and the names and nicknames used by interceptees to address such individuals during intercepted telephone conversations. I submit there is also probable cause to believe that some of the individuals named above have committed federal money laundering offenses, including violations of Title 18, Section 1956 (h).

7. This investigation has produced compelling and reliable evidence that JAMAHL LEONARD, of 594 Marsh Road, Pittsford, New York, is the head of a local marijuana distribution organization. The investigation has revealed that LEONARD, and his associates, distribute large quantities of marijuana to customers in and around Monroe and Wayne County, New York, Philadelphia, Pennsylvania, Bloomington, Indiana, and Asheville, North Carolina. The marijuana originates from the Massena, New York area and is transported to Monroe or Wayne County, where they are further processed, repackaged, and distributed. Jason MONTROY has been identified as the main courier transporting the drugs. It is believed that the marijuana source is a Native American(s) from the Akwesasne Tribe. Essentially, the marijuana is being grown in Canada, transported across the United States border to various stash locations inside the United States, and then further distributed. The Akwesasne Indian reservation is located in the Massena/Hogansburg, New York area, and encompasses the United States and Canadian border. The following describes some, but not all, of the illegal activity comprising the conspiracy in question.

## HISTORY AND BACKGROUND OF INVESTIGATION

### I. Law Enforcement Initially Targets Michael Burton

8. In February of 2007, Agents initiated an investigation on Michael BURTON who was then identified as a poly-drug trafficker operating in the Wayne County, New York area. During the course of the investigation, agents conducted surveillance on BURTON and made several controlled purchases of narcotics.

9. During the investigation of Burton, a WAYNENET Confidential Source (hereafter CS) stated that BURTON told him/her he had been selling marijuana and cocaine for approximately ten years. The CS has known BURTON for approximately five years. He conducted multiple narcotic transactions in his/her presence. The CS also stated that in 2006, he/she observed approximately one kilogram of cocaine and four pounds of marijuana at BURTON's residence.

10. On March 8, 2007 the CS was utilized to make a controlled purchase of approximately one quarter pound of marijuana from BURTON for $350.00. During a laboratory analysis, the substance tested positive for marijuana.

11. On March 17, 2007, the CS was utilized to make a

controlled purchase of approximately 2.75 grams of cocaine from BURTON for $125.00. During a laboratory analysis, the substance tested positive for cocaine.

12. On May 20, 2007, law enforcement seized BURTON's trash. Agents found 10 large bags with a strong scent of marijuana. There was also a large box containing several additional large trash bags and two gallon sized ziploc storage bags. The ziploc bags had marijuana seeds and a green, leaf residue.

13. On June 1, 2007, Wayne County Court Judge Stephen R. Sirkin ordered an ex-parte eavesdropping warrant on BURTON's cellular telephone, (315) 576-3635. (Burton Line #1). Interception began on June 7, 2007. On July 6, 2007, a 30-day extension Order was granted by Wayne County Court Judge Stephen R. Sirkin.

14. On June 28, 2007, Wayne County Court Judge Stephen R. Sirkin ordered an ex-parte eavesdropping warrant on a second BURTON telephone, (315) 879-5806. (Burton Line #2).

15. During the course of the interception of BURTON's two telephones, agents overheard numerous incriminating phone calls relating to narcotics trafficking. The interception further

revealed that one of BURTON's sources of supply was an individual identified as Levar FANIEL of 5834 Ridge Chapel Road, Williamson, New York. Agents monitored several calls listening to BURTON order quantities of marijuana from FANIEL.

16. For example, on June 12, 2007, at approximately 8:20 p.m., agents intercepted an incoming phone call to (315) 576-3635 (Burton Line #1), from (585) 705-5714. The investigation revealed that Levar Faniel was utilizing this telephone. During the call, Burton inquired "...something good boy?". Faniel replied "Yeah, think. I don't know. You can check it out. I think its nice." Based upon your deponent's training and experience and knowledge of the investigation, FANIEL called BURTON and stated he (FANIEL) had marijuana available for sale. FANIEL told BURTON he (BURTON) could come over and check out the quality of the marijuana.

17. On June 15, 2007 at approximately 5:52 pm, agents intercepted an incoming call to (315) 576-3635 (Burton Line #1) from cellular telephone (585)705-5714, used by Faniel. Faniel inquired: "What's going on? Um, I don't know. The only way I can get a break is if I get 10." Burton later replies "What's the break on that?", to which Faniel states, "Twenty five fifty". BURTON told FANIEL he (BURTON) didn't think that was much of a price break and stated he wanted to deal for six pounds of

marijuana. Based on your Deponents training, experience and knowledge of this investigation to date, Faniel advised Burton that he was able to reduce the price of the marijuana to $2,550 per pound if Burton purchased a minimum of 10 lbs. Burton agreed to purchase some marijuana for $2,550 per pound, and that Faniel would deliver it to Burton later that day.

18. Following this call, agents observed FANIEL leave his residence, 5834 Ridge Chapel Rd., Williamson, New York, (hereafter FANIEL's residence) and drive directly to BURTON's residence, 34 Gaylord St., Sodus, New York (hereafter BURTON's residence). At BURTON's residence, agents observed FANIEL get out of his vehicle carrying a large, yellow plastic bag. This bag looked capable of holding six pounds of marijuana.

19. On July 4, 2007, at approximately 1:06 PM, agents intercepted an outgoing telephone call from cellular telephone (315) 879-5806 (Burton Line #2), to cellular telephone (585) 370-0099, a cell phone subscribed to by Levar Faniel. In sum and substance, Burton called Faniel and stated, "Where you at?", Faniel responded, "I'm in Sodus right now. Why you gonna be home for like an hour?", Burton responded, "I ain't home yet, I'm in Ontario, but I might need two of those". Faniel responded, "Alright, well um, yeah, give me a call. Well, alright, yeah, give me a call when,

I'll give you a call in a little bit because I got to run home", Burton responded, "Alright". The call ended a short time afterwards. Based upon my training and experience, and the investigation to date, I believe that Burton called Faniel to make arrangements to meet to obtain a quantity of marijuana.

20. On July 25, 2007, agents executed a search warrant BURTON's residence. During the search, agents found three bags of marijuana weighing 98.68 grams. Agents also found a baggie of cocaine weighing 1.55 grams and approximately 6.7 ounces of Niacinamide, a cutting agent for cocaine. Agents also found numerous items used for the distribution of controlled substances, including (2) scales, baggies, and two large, freezer bags used for the storage of bulk marijuana. Agents also found dominion and control documents in BURTON's name and an empty safe.

**II. Law Enforcement Begins Targeting Levar Faniel**

21. Based on the intercepted conversations and surveillance, agents initiated several state wiretaps on Levar FANIEL's telephones.

a) On July 10, 2007, County Court Judge Stephen R. Sirkin ordered an ex parte eavesdropping warrant on telephone number (585) 705-5714, utilized by Levar Faniel. (Faniel

Line #1).

b) On July 11, 2007, County Court Judge Stephen R. Sirkin ordered an ex parte eavesdropping warrant on telephone number (585) 370-0099, utilized by Levar Faniel. (Faniel Line #2). Interception over this line was extended for a second thirty days by Order on August 9, 2007.

c) On July 19, 2007, County Court Judge Stephen R. Sirkin ordered an ex parte eavesdropping warrant on telephone number (631) 903-3247, utilized by Levar Faniel. (Faniel Line #3).

22. Interception of these three phone lines began giving agents a more clear picture of the hierarchical supply chain involved in this case. Within a few days of interception, agents were able to determine that Faniel had other customers, and that his marijuana supplier was an individual named Jamahl Leonard.

23. For example, on July 12, 2007 at approximately 3:13 PM, target telephone (585) 370-0099 (Faniel Line #2) received a phone call from telephone instrument (585) 370-2667, subscribed to and utilized by Matthew J. FOX of 1200 Paddy Lane, Ontario, New York. In this call, FOX asks FANIEL what time he was getting out of work.

FANIEL states " Umm, I"ve gotta go run and see him first, and then, then I can, probably like 4 or 4:30, probably more like 4:30, I'll be coming through there." FOX states "Yah, just gimme a call. I'll ahh, yah, give me a call. I'll be home till five."

24. One half hour later, agents conducting surveillance observed LEVAR FANIEL leave his place of employment at Iron Mountain Secure Shredding, located in Henrietta, New York, and arrive at the residence of Jamahl LEONARD, 594 Marsh Rd, Pittsford, New York. FANIEL entered the residence at approximately 4:04 PM and exits the residence at approximately 4:30 PM with a package in his hands. Surveillance team members then followed FANIEL directly to 1200 Paddy Lane. FANIEL was observed entering the residence at with the same package. Based upon your affiant's training, experience, and knowledge of this investigation, the calls and subsequent surveillance show FOX requesting a marihuana delivery from LEVAR FANIEL. LEVAR FANIEL advises FOX that he has to stop at his source of supply, that being 594 Marsh Rd. Pittsford, New York, where he picks up a package of marihuana and subsequently delivers that package to FOX's residence at 1200 Paddy Lane.

25. On July 15, 2007 at approximately 4:27 PM, an outgoing call from (585) 370-0099 (Faniel Line #2) was intercepted to telephone instrument (585) 370-2667, which is subscribed to and

utilized by MATTHEW FOX. In sum and substance LEVAR FANIEL asks MATTHEW FOX, "How many hours were you trying to work?" MATTHEW FOX states, "I don't know, he seen somebody, but I don't think he got a lot, so ah, I was hoping between me and him, probably uhh, 5-0." Faniel later replies, "I don't know. I'll have to talk to him. I know he said 30 hours." Based upon your affiant's training, experience, and knowledge of this investigation, the reference to "hours of work" is not employment related, but rather refers to the number of pounds a customer wants to buy. Here, FOX is telling Levar FANIEL that he needs a large quantity (perhaps 50 lbs.) of marihuana from FANIEL'S source. FOX's conversation shows that FOX is an active marihuana distributor, most likely with another individual that he refers to.

26. The next day, July 16, 2007, at approximately 8:53 AM, agents intercepted a incoming call to Faniel's phone (585) 370-0099) (Faniel Line #2) from cellular telephone (585) 370-2667, subscribed to FOX. During this call, FOX asks Faniel "What's the game plan?". Faniel replies, "Ummm, ah, you want him to come see you?" Fox replies, "Yea, ahh, whenever." Based upon your affiant's training, experience, and knowledge of this investigation, particularly in light of the surveillance which

followed, FANIEL told FOX that his source of supply was going to deliver a quantity of marijuana to FOX.

27. Toll records show that two minutes later, at 8:55 AM, Levar Faniel, now using a different cell phone, (631) 903-3247 (Faniel Line #3), calls (347) 426-7531, subscribed to a Tom Jones of 112 High Street, Philadelphia, Pennsylvania. It is later determined that this phone line was being utilized by Jamahl Leonard, of 594 Marsh Road, Pittsford, New York. Three days later, application would be made to Judge Stephen R. Sirkin to begin eavesdropping on Leonard's line as well.

28. Four minutes later, FANIEL then called FOX back using Faniel Line #2. FANIEL told FOX that his source of supply, LEONARD, was still sleeping. FOX asks, "What's he say?", to which FANIEL replies "You know, he's still sleeping. Now he's talking like it might only be 20 hours." FOX says "Oh, yeah?" Faniel says "Umm, yeah, but he goes, him know I'm lying in bed right now". FOX says "Let him know what?". Faniel states: "I, he said, he didn't know if there was, you know, a few more. But he's being lazy. He won't get up and check because he's laying in his bed." FOX says, "Oh, oh, alright", to which Faniel replies "So, there possibly might be some more." Faniel later states, "...I'll get him up by 11:00 o'clock and try and get him out there by noon." Based

upon your deponent's training and experience and knowledge of this case, it appeared that FANIEL was attempting to have his source of supply, LEONARD, make direct contact with FOX that day.

29. At approximately 11:39 AM, FANIEL called FOX and told FOX that LEONARD was still sleeping and was not going to wake up until early afternoon.

30. At approximately 12:39 PM, FANIEL, using (585) 370-0099 (Faniel Line #2), called FOX on his cellular telephone, (585) 370-2667. FANIEL told FOX "I guess he is going to head out". FOX asks, "How long you think?". FANIEL says "Probably umm, I don't know, he just. Hang on, I'll call him right back, it shouldn't be like what, 40 minutes before he gets there, not even. Half hour, 40 minutes."

31. In a series of phone calls between 1:15 PM to 1:22 PM, agents intercepted phone calls to and between (585) 370-0099 (Faniel Line #2), and (585) 478-3826, which subscribed to by Shannon Winter, 6885 Maple Avenue, Sodus, New York. This investigation has revealed that Jamahl LEONARD also utilizes this cell phone. During these phone calls, FANIEL is attempting to provide LEONARD with directions to Matthew FOX's residence at 1200 Paddy Lane.

32. At approximately 1:26 PM, NYSP Investigators Michael Bruggman and Mark Braun observed a green Buick LeSabre bearing NY Reg. DXU-7492 arrive at the residence of 1200 Paddy Lane. Investigators then observed Jamahl LEONARD exit the vehicle and enter the residence. Leonard remained in the residence fo approximately one hour. The green Buick LeSabre was registered to Leonard's brother, Johri J. Leonard.

33. In or about July of 2007, a hidden "remote" video camera was installed directly across the street from Jamahl Leonard's residence at 594 Marsh Road, Pittsford, New York. On July 27, 2007, at approximately 11:25 AM, agents observed a green 1998 Ford Pickup truck, bearing NY Reg. 865-20JW, arrive at the residence. The truck was then backed into the garage at this residence, and the garage door was shut. The truck was registered to Jason A. Montroy, showing an address of 60 Little River Road, in Canton, New York. At approximately 12:09 PM, members observed Montroy's pick-up truck pull out of Leonard's garage and it departed to the north on Marsh Road.

## III. Law Enforcement Begins Targeting Jamahl Leonard's Phones

34. On or about August 1, 2007, agents applied to Wayne County Court Judge Stephen R. Sirkin for an Order authorizing eavesdropping on telephone instrument number (585) 478-3826, subscribed to Shannon Winter of 6885 Maple Avenue, Sodus, New York (Leonard Line #1). Interception on that phone began on August 1, 2007.

35. On August 2, 2007, at approximately 10:15 AM, agents observed a green F-150 pick-up truck, bearing NY # 865-20JW, arrive at 594 Marsh Road, in Pittsford, New York. The truck was being driven by Jason MONTROY. The truck was backed into the garage at this residence and the garage was shut. One hour later, the garage door opened and the green F-150 departed to the north on Marsh Road. Agents followed MONTROY eastbound on Interstate 90 and then northbound on Interstate 81. Surveillance was terminated on Interstate 81 approximately ten miles north of Syracuse, New York.

36. Later the same day, agents observed, via pole camera, LEONARD place two backpacks into his Chevrolet Tahoe bearing NY license plate DEZ 1337. New York DMV records revealed the Chevrolet Tahoe is registered to Jamahl LEONARD, 6005 Lake Rd., Sodus, New York.

37. Shortly thereafter, another individual, later identified as Daniel WOODWARD, entered LEONARD's Tahoe and drove away from the residence. Agents followed WOODWARD west on Interstate 90 near Pembroke, New York, where surveillance was terminated.

38. That same day, August 2, 2007, at approximately 3:11 PM, agents intercepted an outgoing call from (585) 478-3826 (Leonard Line #1) to (585) 233-9469, subscribed to Stephanie Cancilla. Based upon the whole of our investigation, it was determined that Daniel WOODWARD was utilizing this cell phone. Stephanie Cancilla is known to be WOODWARD's girlfriend and lives with WOODWARD.

39. During the course of their conversation, WOODWARD answers the phone saying "Yes dear." Leonard tells WOODWARD "Don't forget you got to hold that brown bag I gave you with the headies in it". WOODWARD responds "Yeah. Yup.". Leonard tells WOODWARD "Hey, call me in a couple of hours. Call me every two hours." Based upon my training and experience and involvement with this investigation, I know that "headies" refers to the type or quality of marijuana.

40. Two hours later, at approximately 5:40 PM, agents intercepted an outgoing call from (585) 478-3826 (Leonard Line #1) to (585) 233-9469. In this call, WOODWARD answers, saying "What's Up?". LEONARD replies, "It's been two hours!" WOODWARD says "I

know. I'm just about to get off and get some gas. I was gonna give you a call." After further discussion, LEONARD tells WOODWARD, "...call me at 7:30 p.m."

41. On August 3, 2007, at approximately 1:56 PM, agents intercepted a call agents intercepted an incoming call from (585) 576-4706, subscribed to by James KNOX. The call came into (585) 478-3826 (Leonard Line #1). During this call, LEONARD tells KNOX that he was "goin' to rent a car this second." KNOX asks "why you doin' that?". LEONARD says "cause I don't have no vehicle." KNOW asks "what the fuck happened to the Tahoe?". LEONARD responds that he "let somebody borrow it for a couple days." KNOX ask "oh. Oh. Oh. Who? Danny?" LEONARD replies, "Yeah.". KNOX then says, "oh, well that's okay. That's money in the making then. It don't matter." KNOX asks "What, is he goin' down to North Carolina again?" Based upon my training and experience, as well as my participation in this overall investigation, it is believed that Daniel WOODWARD was transporting marijuana down to a customer in North Carolina, utilizing LEONARD's vehicle, in order for the organization to make money. LEONARD was concerned about this trip and asks WOODWARD to call him every couple of hours.

42. Later in this investigation, as will be more particularly described below, we have learned that one of LEONARD's customers is

a Francisco FRANCO, who lives in or near Asheville, North Carolina. Toll record analysis of Leonard's phones shows numerous and recent contacts between Leonard's target phones and a phone utilized by FRANCISCO FRANCO throughout this investigation. On the dates WOODWARD traveled to North Carolina, there were several contacts between LEONARD and FRANCO. Toll record analysis also showed four (4) contacts between FRANCO's cell phone and WOODWARD's cell phone at the time that WOODWARD was traveling to North Carolina.

43. On August 6, 2007, surveillance officers observed Jamahl LEONARD exit his residence at 594 Marsh Road operating a green Buick LeSabre, NY Reg. DXU-7492. At approximately 2:31 PM, LEONARD arrives at the residence of CHRISTOPHER LICATA, at 84 Gould Street, Rochester, NY. LEONARD is observed entering the residence with a weighted black plastic bag. At 2:41 p.m., LEONARD exits the residence without the black plastic bag, gets back into his car, and leaves the area. Approximately one minute later, LICATA calls LEONARD on Leonard Line #1. CHRISTOPHER LICATA who was utilizing telephone instrument (585) 820-4414. In Call # 163, LICATA tells LEONARD that he is "fucking broke dude...." LEONARD tells LICATA "I got ya, I got ya. I'm just in a pissy mood today already anyways." LICATA says "I got, I'm fucking dead broke here almost, I got fucking nothing. You know I need to get everything I can out of everything." LEONARD replies "I know. I got ya. I'm not

worried about it. I'm not worried about it. It's, its not a big deal. I got ya." Based upon my training and experience, and knowledge of this investigation, it is my belief that LICATA owes monies to LEONARD for marijuana previously provided to him.

44. After the phone conversation, LEONARD continues driving to the address of 1101 Bay Street, Webster, New York. This is the residence of JAMES KNOX. On Leonard exits the car, now carrying a large, multi colored bag, 2 ½' by 2'. LEONARD stayed at the residence for 15 minutes and left empty handed.

45. On August 7, 2007, at approximately 3:37 p.m., agents monitoring the live surveillance camera observed Levar FANIEL arrive at LEONARD's residence at 594 Marsh Road. At approximately 4:00 p.m., agents observed Jason MONTROY arrived at LEONARD's residence at 594 Marsh Road, driving his F-150 green pick up truck. The truck backed into the driveway and went into the garage, whereupon the door was shut. At approximately 5:43 p.m., the garage door opened and MONTROY drove the truck out of the residence departing north on Marsh Road. Agents followed MONTROY north on Route 81, to the area of Route 37 in the town of Massena, New York.

46. At approximately 8:34 p.m., LEONARD called Christopher LICATA at (585) 820-4414, using LEONARD Line #1. In that call,

LEONARD told LICATA that he would be over at his residence by 9 p.m.. LICATA then asked LEONARD, "If uh, can I come over right now so I, are you all set or no?" LEONARD says "O.K. well, uh, wait like 10 minutes and take off." At 8:56 p.m., a white Maxima pulled into the driveway. Because it was dark, the camera was unable to conclusively make out the person, but it was believed to be LICATA. At approximately 9:17 p.m., an unknown male exited the LEONARD residence carry a large duffle bag. The male then entered the white Nissan Maxima and departed the area.

47. At approximately 10:31 p.m., LICATA called LEONARD and said "uh, I was just saying, you're all set if you wanted to, if you wanted to get together tonight." LEONARD says "oh, really." LICATA continues, "and I just talked to, I just talked to B, and he's bitching and moaning and he wants to come up, he's like, you guys fucked me over. Not, he's not talking about you, he's talking about me. He's like you fucked me over last time. Now he gets me up there, you know, so we really, we really gotta, we really gotta do something for him." LEONARD replies "I got ya". LICATA states "Just like, just like what we did today for him, you know that will be fine." Based upon my training and experience, and my knowledge of this case, I believe LICATA obtained a portion of the marijuana which was brought from MONTROY to LEONARD earlier in the day. LICATA then called LEONARD and told him he was all set, meaning

that he sold the marijuana and had money available for LEONARD to pick up.

48. On August 9, 2007, beginning at approximately 10:18 a.m., agents begin intercepting incoming phone calls to LEONARD Line #1, from (302) 528-6831, subscribed to Steven POLITOWSKI at 1622 New London Road, Landenberg, PA. Landenberg is a suburb of Philadelphia, PA. In these calls, it is apparent that POLITOWSKI is driving north to see LEONARD. At one point, LEONARD is overheard providing directions to POLITOWSKI: "and then, ah, get off at exit Forty Five. I believe it is for Four Ninety." At 3:32 p.m., agents observed via live surveillance camera a black Nissan, Pennsylvania Registration GST-7872, arrive at LEONARD's residence. Pennsylvania DMV records show the vehicle is registered to Steven Politowski at 1622 New London Road, Landenberg, PA. Agents saw the car pull into the garage and the garage door immediately closed. At approximately 5:17 p.m., the garage door opened and the black Nissan drove away. The car was followed back onto 490 East, where it got back onto the NYS Thruway and headed east. Surveillance was terminated at Canandaigua, NY. Based upon my training and experience and my knowledge of the overall investigation, I believe POLITOWSKI drove to Rochester, NY to receive a quantity of marijuana from LEONARD.

49. On the morning of August 10, 2007, agents reviewed the overnight recording video tape from the surveillance camera. They noted that at approximately 4:30 a.m., Daniel WOODWARD exited LEONARD's residence and got into LEONARD's Chevy Tahoe. At approximately 8:15 a.m., agents intercepted a call from LEONARD, utilizing LEONARD Line #1, as he called WOODWARD at cell phone number (585) 233-9469. During that call, LEONARD asks WOODWARD, "Where you at?". Woodward responded "Shit, I don't know." LEONARD says "Well, where's the last stop you went by jack ass." Later, LEONARD says, "You left the house three hours ago, you must almost be to Scranton." WOODWARD says "Three hours, yeah, I guess so, I'm going by Gypsen." LEONARD says "Oh, you're pretty far, you're in PA."

50. At approximately 9: 28 a.m., LEONARD using LEONARD Line #1, called Steven POLITOWSKI and left a message saying 'Yo, Steve, what's going on buddy? Umm, give me a call, my buddy Danny ran out yesterday, he's he's already on ahh, he's on 476. Call me back as soon as you get this, would ya." Based upon my training and experience, along with my participation in this case, I believe that LEONARD sent his buddy, Danny WOODWARD down to Steven POLITOWSKI's house to pick up the money owed to him from the previous day sale which occurred between POLITOWSKI and LEONARD on Marsh Road.

51. One hour later on August 10, 2007, at approximately 10:23 AM, agents observed (via live surveillance camera monitoring 594 Marsh Road) a black GMC Sierra, Indiana Registration 586 W. This vehicle was registered to Nathan CANARY at 802 West Eighth Street, Bloomington, Indiana. Similar to other vehicles arriving at this location, the truck pulled into the garage and the door immediately closed. At approximately 12:39 p.m., the 2005 GMC Sierra exited the garage and traveled north on Marsh Road. It was then followed to Interstate 490 East. The truck entered the New York State Thruway traveling westbound. At approximately 1:36 P.M., agents effected a traffic stop of the vehicle near Batavia, Genesee County, New York. The operator of the vehicle was identified as NATHAN J. CANARY of 580 West Dittmore Road, Bloomington, Indiana. CANARY was ultimately asked for consent to search his vehicle, which he gave. While searching the bed of truck, agents located two large, black duffle bags, containing approximately 75 pounds of marijuana. The marijuana was field tested on August 14, 2007 by Inv. J. Norton, and did test positive for marijuana. So as not to jeopardize the ongoing wiretap investigation, a decision was made to release CANARY at that time, hoping that CANARY would speak with LEONARD about the incident over the phone.

52. Coincidentally, while the CANARY vehicle was pulled over on the side of the Thruway, a telephone call was intercepted between brothers Johri Leonard and JAMHAL LEONARD. Johri Leonard called Leonard Line #1 using cell phone number (301) 787-2372. Johri states: "Holy Shit". Jamahl says "What's up?" Johri says "see, um, I don't know. I pretty god damn positive I just seen your boys on the side of the road." Jamahl asks "Are they getting harasssed?" Johri says, "Yeah. I'm pretty sure they're done." Jamahl asks "Where?" Johri says "Just past the Genesee Community College, whatever that is." The surveillance video revealed that approximately one hour after CANARY left the LEONARD residence, Johri Leonard also left the residence. Other phone calls intercepted during this investigation revealed that Johri Leonard was leaving that day, driving west to move to the state of California.

53. Approximately ten minutes later, LEONARD calls on Leonard Line #1 to Daniel WOODWARD who was then driving back from Pennsylvania. LEONARD asks "I was just checking on you". WOODWARD says "checking out the country side". WOODWARD continues "I'm on the 8-1 already, so." LEONARD replied "that a boy, well, I'll see you in a little while." At 6:17 p.m., agents observed via live camera WOODWARD pull into LEONARD's garage, and the door immediately closed. Based upon my training and experience, and my

involvement in this case, I believe that WOODWARD returned from Pennsylvania with money for LEONARD.

54. Later that night, at approximately 9:14 p.m., LICATA called LEONARD on Leonard Line #1. LICATA says "Um, I got to pick my buddy up at the airport in a half an hour." LEONARD replies "Yeah?" LICATA says "Can I, uh, get up with you after I drop him off?" LEONARD replied "ah, yeah, probably. I just, I, I got to come see you. There's no point in coming over here.". LICATA stated "Everything's all straight though, right?" LEONARD replies "Yeah, it's just not here." Based upon my training and experience, and involvement with all aspects of this case, I believe that in light of the seizure earlier that day from CANARY on the NYS Thruway, LEONARD removed any marijuana from his residence as a precautionary measure.

## IV. Leonard Changes His Cell Phone Number, and shifts the Marijuana Drop Off Location from 594 Marsh Road to Terry Buda's house at 3127 Shepherd Road, Williamson, NY.

55. On August 12, 2007, LEONARD changed his cellular telephone number from (585) 478-3826 (Leonard Line #1) to (530) 414-4531 (Leonard Line #2), but retained the same phone with the same SIM (subscriber identity module). This change was done by Shannon Winter, who did so while she was out of state. It is

believed that she is currently in the state of California. Both Leonard Line #1 and #2 are in Shannon Winter's name.

56. On August 13th, 2007, Sgt. John Colella of the Wayne County Narcotics Enforcement Team applied for a GPS Tracking Device to surreptitiously seize 1999 Chevy Tahoe, color gray, bearing New York Registration DEZ1337, and Vehicle identification number # 1GNEK13R6XJ415190, a vehicle registered to Jamahl Leonard, DOB 03-25-79. The warrant was signed on August 13th, 2007, by Supreme Court Justice, Acting, Stephen R. Sirkin.[1]

57. On August 14, 2007, at approximately 2:56 p.m., LEONARD received an incoming call from JAMES KNOX. KNOX called Leonard Line #2 using (585) 576-4706. KNOX says "Later tonight, can I swing out to you, my brother's going away, my buddy Andy needs to hang and I need to see you." LEONARD replies "I guess." KNOX says, "You guess, alright." LEONARD says "If it, if it, not for you, I don't want to then." He continues "You know what I mean. Only for you, I don't, anybody else, fuck em. I don't give a

---

[1] On September 12th, 2007, Sgt. John Colella of the Wayne County Narcotics Enforcement Team applied for an amended and extended GPS seizure warrant to surreptitiously seize 1999 Chevy Tahoe, color gray, bearing New York Registration DEZ1337, and Vehicle identification number #1GNEK13R6XJ415190, a vehicle registered to Jamahl Leonard, DOB 03-25-79. The warrant was signed on September 12th, 2007, by Supreme Court Justice, Acting, Stephen R. Sirkin.

fuck." KNOX says "Yeah, my buddy Andy, he'll pay, and my brother will pay." KNOX later says "I mean Andy, Andy and my brother, they'll probably just both take a little one, you know what I am saying?" Based upon my training and experience and knowledge of this case, I believe that KNOX was trying to obtain pound quantity of marijuana ("little one" is commonly used to refer to one pound).

58. On August 15, 2007, at approximately 12:28 p.m., Daniel WOODWARD calls LEONARD on Leonard Line #2. In sum and substance, WOODWARD tells LEONARD that he just bought a new Camaro. LEONARD becomes irate saying ".....Listen, you need but one motherfucking vehicle that runs good. That is not a shitty piece of shit. If I see you buy any vehicles besides something you can fucking drive around and work in, I'll tell you what". WOODWARD says "what are you talking about, man?" LEONARD says "I'll lose it." LEONARD later calms down "I know, I just like to bitch and moan at you guys. Never see me wasting money on bullshit like this." WOODWARD says "because you can do whatever you want to do. Maybe that's the point of it, you know what I'm saying?" LEONARD says "Yeah I know. Do you ever see what I want to do with my money? I want to save it." WOODWARD says, "see, you can make money off of your money, ok." LEONARD says "You could too, idiot. Geez, you make me want to beat you. Damn, she says you are retarded."

59. On August 18, 2007, at approximately 10:20 a.m., LEONARD called Terry BUDA, a friend of his who lives 3127 Shepherd Road, Williamson, NY.. He says to BUDA, "Hey, well my, my buddy might be there soon he might beat me there just be prepared, OK." LEONARD said, "I'm just leaving right now. I just got to stop somewhere real quick on the way." BUDA replied, "All right." At approximately 10:27 a.m., LEONARD called WOODWARD and said he was going to stop by WOODWARD's house. LEONARD told WOODWARD, "Oh, I just needed my sealer and shit." Based on my training and experience, and perhaps in light of the CANARY vehicle stop on the New York State Thruway, LEONARD changed the marijuana drop off location from his house on Marsh Road to Terry BUDA's house on Shepherd Road in Williamson. On this date, LEONARD called Terry BUDA to let him know Jason MONTROY would be arriving at his (BUDA's) house. In preparation for MONTROY's arrival, LEONARD then called WOODWARD to find out where his sealer was. Food sealers are commonly used to package marijuana in plastic bags. In fact, the marijuana that was seized from CANARY was sealed in plastic food saver bags.

60. Approximately one hour later, at 11:06 a.m., the GPS tracker (along with officer's personal surveillance) showed LEONARD driving his Chevy Tahoe to and parking at Terry BUDA's residence at 3127 Shepherd Road, Williamson, NY. At 11:35 a.m., agents observed

Jason MONTROY arrive in his pick-up truck at Terry BUDA's residence as well.

61. On that same day, August 18, 2007, at approximately 1:22 p.m., LEONARD received an incoming phone call on Leonard Line #2 from Levar FANIEL. In this call, LEONARD told FANIEL that he was over at Terry BUDA's house. FANIEL said he would stop by.

62. At approximately 2:18 p.m., agents observed a red, Chrysler Sedan, bearing NY Reg. CSN-6180, driving south on Fisher Road near state Route 104. NYS DMV records show that this vehicle is listed in the name of Jeremy SAWYER, 4382 Old Ridge Road, Williamson, New York. Agents observed both SAWYER and LEONARD in the vehicle. Agents also observed that MONTROY's vehicle was still at BUDA's residence at that time. Agents decided to follow SAWYER's vehicle. Eventually agents followed the vehicle to Dick'S Sporting Goods, located in Webster, NY. At 3:10 p.m., agents observed LEONARD inside Dick's Sporting Goods. Agents observed LEONARD purchase five oversized, nylon hockey bags. Agents obtained the store surveillance tape and the receipts.

63. The next day, August 19, 2007, at approximately 8:47 a.m., agents intercepted and incoming call from Jeremy SAWYER on Leonard Line #2. LEONARD says "Hey, what's up buddy?" SAWYER

responds "I'm at a rest stop before 15, taking a little nap" LEONARD tells SAWYER "Oh, all right buddy. Well, give me a call when, a just give me a call when you're like an hour away or something." SAWYER replied "All right man." Based upon my training and experience, and knowledge of this overall case, I believe that LEONARD utilized SAWYER to make another marijuana delivery out of state. State Route 15 is a major thoroughfare in the state of Pennsylvania.

64. At approximately 3:50 p.m., agents observed via camera SAWYER arrive at LEONARD's residence. SAWYER exited his vehicle and took a full back pack out of his trunk. SAWYER then placed the bag in LEONARD's garage and stood by his car. At approximately 4:05 p.m., agents observed LEONARD arrive in his Chevy Tahoe. LEONARD, also carrying a backpack, walked into the residence with SAWYER. At 4:44 p.m., agents observed a blue Ford Pick-Up, NY Reg ARZ-6584 pull into the driveway. NY DMV records indicate that the pick up truck was registered to Christopher LICATA. LICATA entered the residence carrying a bag under his arm.

65. Fifteen minutes later, both SAWYER and LICATA left LEONARD's residence. At 5:05 p.m., agents observed a red Chevy Tahoe, NY Reg. DZG-1421, pull into the driveway. NYS DMV records show the truck is registered to Carl MARTINO. As MARTINO exited

his Tahoe, LEONARD exited the residence carrying a backpack and duffle bag that appeared to each be full. Both vehicles left the residence. According to a GPS tracker on LEONARD's Tahoe, he drove to Daniel WOODWARD's residence at 19 Belvue Court in Penfield, NY. At 8:24 p.m., agents observed via camera LEONARD pull into the driveway of his residence, carrying an empty backpack.

66. On August 20, 2007, at approximately 1:31 p.m., LEONARD called WOODWARD on Leonard Line #2 inquiring about his location. LEONARD asked WOODWARD, "Where you at?" WOODWARD replied, "I don't fucking no." LEONARD said, "What do you mean?" WOODWARD replied, "I just got caught up in two different fucking construction things." LEONARD said, "What, on eighty-one?" WOODWARD replied, "Yeah, jeez, I fucking hate this road any more, dude." LEONARD asked, "Are you, you're on 476, right?" WOODWARD replied, "Yes, sir." During this conversation, LEONARD received an incoming call from Tara CUNNINGHAM, his girlfriend. LEONARD told CUNNINGHAM, "I just talked to home boy and I forgot how you told me there was all that fucking construction." CUNNINGHAM replied, "Uh, huh." LEONARD said, "He didn't even make it to the tunnel yet, but he's on 476." CUNNINGHAM replied, "Damn." LEONARD and CUNNINGHAM agreed it would take WOODWARD and hour to get from the tunnel to her house. Based upon my training and experience, and knowledge of the case, WOODWARD was again transporting a quantity of marijuana

to Pennsylvania. Tara CUNNINGHAM lives at 1503 Green Street, Apt. 3, in the city of Philadelphia, Pennsylvania.

67. At approximately 2:40 p.m., LEONARD told CUNNINGHAM that WOODWARD was going through the tunnel right now. At approximately 3:52 p.m., CUNNINGHAM called LEONARD and said she was "hanging out with Danny". LEONARD says "Oh, well, give me a call back when he leaves.". At approximately 4:57 p.m., WOODWARD called LEONARD and told him that he was on his way back from Philadelphia, but there's a bunch of traffic. At approximately 10:06 p.m., agents observed, via camera, WOODWARD pull into the driveway of LEONARD's residence. WOODWARD walked into the residence carrying a small bag in his hand. Based on my training experience, I believe WOODWARD delivered a quantity of marijuana to CUNNINGHAM in Philadelphia, PA, for LEONARD.

**V. Agents Begin Intercepting Calls on a Third Leonard Phone**

68. On August 20, 2007, agents applied for another eavesdropping warrant on (347) 426-7531, which was listed in the name of Tom Jones, 112 High Street, Philadelphia, PA. Based upon previous conversations and toll records, agents learned that LEONARD was also utilizing this phone. Hereinafter it will be referred to as LEONARD Line #3. Please note that Leonard Line #2

is still active. Indeed, even as of this writing, agents are currently operational and intercepting on LEONARD Line #2 and #3.

69. On August 21, 2007, at approximately 12:22 p.m., LEONARD called Matthew FOX on Leonard line #3. LEONARD told FOX, "I finally...I finally just talked to him after that time, I talked to him yesterday and he said, oh yeah, we'll be hanging out. He said his boy never ended up coming through yesterday, but he's supposed to be calling him here in just a little bit. He said he'd call me by four or five, and we should be hanging out tomorrow." FOX replied, "alright." LEONARD said, "So I really would imagine we are. I will, ahh, I'll give you a call as soon as I hear from him later." FOX replied, "alright." LEONARD added, "and ahh..dude, I got some of the ahh..I got some ahh, headies, too, and shit. Maybe I'll ahh..maybe I'll run out there later and bring you some." FOX replied, "alright." Based on my training and experience, when LEONARD says "I talked to him" he was referring to his source of supply. When he said "we'll be hanging out", that means that marijuana will be coming into town. When he refers to "headies", he is referring to a specific type or quality of marijuana.

70. On August 21, 2007, at approximately 12:30 p.m., Nathan CANARY called LEONARD on Leonard line #3. CANARY told LEONARD, "Wait, the only place it's hot is out there. And it's not hot if

your fucking, if you got plates from there, you know." LEONARD replied, "no doubt." CANARY added, "But, I mean, I definitely wouldn't want to be driving you know, my truck out there again, you know, I mean I think that would be kind of retarded because of the...." LEONARD replied, "Oh yeah." CANARY said, "Dude, I met all of them like shit, the had like ten fucking cars there, fuck, they all know me now. But I don't think that, I don't think it would be a big deal for him to run all the way down here you know." LEONARD replied, "No, I know, I fuckin', um, and I think now I can get him to come out here now, cause him and his girl are like half split up right this second and shit." CANARY said, "Dude, you can take fifty to me man, you can take more than fifty dude, you have no, I mean the, OK, what I was saying about everything tripling is already happening, basically, and it'd be the way it is now cause everybody this town is crazy right now. And there is nothing, there's the, there's the middies and the middies are fucking going for three jeemalee, it's ridiculous." Based on my training and experience, CANARY was talking to LEONARD about the traffic stop of CANARY near Batavia, New York. CANARY also talked about the risk of driving out to New York with his own truck, as the cops know him now. In the conversation, CANARY also told LEONARD he could distribute 50 or more pounds of marijuana, and tells LEONARD that "middies" (a type or quality of marijuana) are really profitable.

71. On August 21, 2007, at approximately 12:45 p.m., agents observed, via camera, a Chevrolet Silverado pick-up truck, bearing New York license plate, 19048JW, pull into LEONARD's driveway. The vehicle is registered to Matthew FOX.

72. On August 21, 2007, at approximately 1:00 p.m., LICATA called LEONARD on Leonard line #3. LICATA asks "What's going on?" LEONARD told LICATA, "Uh, not sure. My boy never ended up answering the phone again, last night. I just talked to him when I got up. Twenty minutes, a half-hour ago, and he said uhh, sorry about yesterday, and hopefully we can hang out tonight." LICATA replied, "OK." LEONARD added, "I mean, not tonight, not tonight, not tonight, tomorrow though. Hopefully, he'll be good tonight, and we can hang out first thing tomorrow." LICATA replied, "alright." Based on my training and experience, I believe LEONARD tells LICATA he did not receive a shipment of marijuana yesterday but he (LEONARD) was expecting one. LEONARD told LICATA he could provide him with marijuana the following day.

73. On August 21, 2007, at approximately 8:51 p.m., LEONARD received a call from Francisco FRANCO on LEONARD line #3. LEONARD says "I'm waiting for my boy to call me man. He's trying, I know, I know he's trying, I know that he's trying." FRANCO replied, "Well, I'm saying all right, I just got people coming you know, I'm

just trying to keep you on your foot, on your toes." LEONARD said, "Well, here, I'm just fucking waiting to hear the official fucking yes." FRANCO replied, "right." FRANCO added that, "If worst to worst, the I gotta come up there with the money, dude." LEONARD later said, "Then get them the fuck up here, what is wrong with you?" FRANCO said, "Cause it's not one person, it's like a multiple casting brother, you know what I mean." LEONARD said, "You know what's complicated is me getting it down there, and then taking three or four days for me to do anything, because I can't do anything else while it's sitting down there, if you can get kids up here, it makes it a thousand times easier for me. I just had, I got fucking everybody I know will come right here, or has got their money sitting here, know what I mean. Now, it's not that I'm putting you off or anything, I'm just, I send it down there and I gotta wait at least three days pretty much, you know what I mean before, I can do anything again, and I, you know I got kids sitting here with fucking, I got a few kids sitting around with a hundred thou, couple hundred thousand dollars, or I got kids that I sended down there, and the kid has to sit there for a half an hour and he can turn around and come home instead of having to sit there for all fucking day. Tell those kids to get their shit together." Later, LEONARD added, "No, you somewhat have it together, you still got a bunch of my money down there." FRANCO replied, "No shit, I have it all here, so I have to get in the car with everybody's

money and just get help, is that what you are saying?" LEONARD said, "No, but it makes it a hell of a lot fucking easier if you just come all the way up here." Later in the conversation, FRANCO told LEONARD, "Hey, all right, so listen. I'm gonna do some talking to my friends flying in here tonight, Okay. And I'm gonna talk to some other people. I gotta go to their houses and talk to them but, you know, maybe I can rally up like a hundred and thirty grand. Maybe that, you know what I mean, I don't have to worry about but I get all the way the fuck up there and back. It's so far away, you know." LEONARD later replies: "if you could just get all those kids together so home boy could breath in and breath out and not have to fucking sit there all day it makes a humungous difference." FRANCO says "Well, I'm trying to tell you that it's like that right now, but I need five spindles." LEONARD replied, "Wow." FRANCO added, "I can sell five hundred pounds today, you know, to different people." LEONARD replied, "We, then, see you actually got kids that have got money for 100 boxes then?" FRANCO replied, "Yes." Based on my training and experience, LEONARD tells FRANCO he is trying to get a shipment of marijuana so that he can get it to FRANCO. LEONARD and FRANCO then discuss the transportation of the marijuana to FRANCO in North Carolina, and that it is problematic because LEONARD has to wait three days for his money. LEONARD tells FRANCO he has kids (local customers) sitting on $200,000 who can pay right away, or he can have one of

his couriers (WOODWARD, SAWYER) travel and return the same day. FRANCO tells LEONARD he can sell 500 pounds of marijuana.

74. On August 22, 2007, at approximately 9:28 pm, LEONARD received an incoming call from (347) 707-0383, the phone utilized by Jason MONTROY. LEONARD said to MONTROY "...he called, I talked to him earlier and he acted like he was pretty much a hundred percent. But I was just waitin' for the final call so I didn't give you the, uh, make you drive all..." MONTROY asks if LEONARD wants to "hang out tomorrow". LEONARD says "I can't, I, not until Friday." MONTROY says "He'll be up here until like Monday, maybe Tuesday." LEONARD responds, "Oh, OK. So we got all weekend to get it done though. Well, that will probably work then. That will work, that will work. Well, I can probably take care of everything here tomorrow for cash. Real quick them. Try and hang out again the next day."

75. On August 22, 2007, at approximately 2:31 pm, LEONARD called Carl MARTINO. LEONARD and MARTINO discussed pending shipment of marijuana. MARTINO ask LEONARD "...home boy can be up here tomorrow for the bunch of 'em. With you I don't know what the deal is." LEONARD says "How much is a bunch man?" MARTINO says "I think he said forty, and then my other friend wanted, uh, I think another twenty." LEONARD says "Well, that'd probably work

out about perfect. We can probably take care of all of them right away tomorrow if they do come." Based upon my training and experience, and understanding of this case, MARTINO is telling LEONARD that he has one guy who is able to buy forty pounds of marijuana, and another who can buy twenty pounds.

76. On August 22, 2007, at approximately 10:28 p.m., Jason MONTROY called Leonard on Leonard Line #3. They discuss the impending shipment of marijuana that MONTROY might transport. LEONARD tells him "...I talked to him. He called me late last night and said, I think he said he saw some outs they might just be waiting for them to be fucking dry enough to fucking hit the road." MONTROY says later, "Get ahold of me please." Based upon my training and experience, and my knowledge of this case, it appears that MONTROY is a courier, transporting marijuana from Northern Upstate New York. Based upon other phone calls and events which will be discussed below, the "him" he refers to is the marijuana source, which we believe is a Native American from the Akwesasne Tribe.

77. On August 23, 2007, at approximately 9:53 am, LEONARD called Matthew FOX on Leonard Line #3. FOX told LEONARD that he was "getting everything together." LEONARD then tells FOX that he brought his counting machine with him so they can "spin it through

the machine real quick." FOX says "Alright. We're thinkin'. Were you thinkin' ninety or no?" LEONARD says "Talk to your friends and see what you want, or I'm gonna fuckin' get rid of 'em, (unintelligle) deal somebody else. So, hurry up." Based upon my training and experience, and knowledge of this case, LEONARD is getting his money together, to be counted in a money counter, so that he can pay MONTROY when he comes. FOX indicates that he might be prepared to get ninety pounds.

78. One minute later, LICATA called LEONARD on Leonard Line #3. LEONARD asks LICATA "....You figure out how long you're gonna wanna hang out today?" LICATA says "Not exactly. But, I gotta talk to some people first.". LEONARD says, "You should get your ass in gear, cuz they're gonna be here. I'm almost, I'm gonna try and if I can, I wanna send all the money back this afternoon." LICATA says "I'm gonna need a little bit more time. I'm dealing with like four people here, so..." LEONARD says "Well, talk to them and figure it out, if you can...(inaudible) together the money right now. Get it together right now so I can send the money back. Fuckin' dude, come on. Make this work, so I can get some more tomorrow."

79. About the same time that LEONARD hangs up with LICATA,

LEONARD is observed arriving in his Chevy Tahoe at Terry BUDA's residence, 3127 Shepherd Rd., Williamson, New York. At approximately 10:19 am, LEONARD called Matthew FOX and gave him directions to BUDA's residence. At approximately 10:55 am, agents observed MONTROY arrive at Buda's residence in his pick-up truck. This is the same pick up truck that had previously been seen at LEONARD's residence on Marsh Road.

80. At approximately 11:14 am, LEONARD called FOX inquiring as to his (FOX's) whereabouts and FOX said he was on Shepherd Rd. At approximately 11:23 am, agents observed FOX arrive in a grey pick-up truck at BUDA's residence.

81. At approximately 1:03 pm, MARTINO called LEONARD on Leonard Line #3. MARTINO tells LEONARD that his buddy wants "half a barrel". LEONARD responds that he doesn't "even have half a barrel left." LEONARD tells MARTINO that his friend "can get them on the next..." MARTINO then says "Yeah, cool. Thank you. I might be able to, let me , uh, see what's up with my other buddy. He might be able to take like 20 of them tomorrow." Based upon my training and experience, and knowledge of this case, MARTINO is attempting to get his hands on "half a barrel" - which is often used to refer to 50 pounds.

82. At approximately 2:36 pm, LEONARD receives an incoming call from LICATA asking for directions to BUDA's house. At approximately 2:49 pm, agents observed LICATA's pick-up pull into the driveway of BUDA's residence. At approximately 3:05 pm, agents observed LICATA's pick-up leave the area of BUDA's residence. At approximately 3:30 pm, agents observed LICATA arrive at LICATA's residence. Agents further observed LICATA retrieve a large hockey duffel bag from the passenger's side door of his pick-up. He then walked into his residence.

83. At approximately 2:38 p.m., LEONARD makes an outgoing call on Leonard Line #3 to WOODWARD. LEONARD tells WOODWARD to get ready for when he (LEONARD) needs him to make a trip.

84. At approximately 3:17 pm, LEONARD called Tara CUNNINGHAM and asked whether she was "gonna wanna hang out again." CUNNINGHAM says "not for second, maybe like, you know, a week or two." LEONARD tells her "that's fine, I was just, I was something I, they were all really nice again today." LEONARD asks if she was coming "tonight", and then adds "I mean, I know, if I were you I would probably bring what I had then. Bring whatever loot you got." CUNNINGHAM says she only has like "forty right now". She says "...I still have fifteeen, and I didn't get paid for the twenty (unintelligible) I gave before." Based upon my training and

experience, and my participation in this case, LEONARD's girlfriend, Tara CUNNINGHAM, is distributing marijuana for him in the city of Philadelphia, PA, where she currently resides.

85. Later that night, at approximately 11:12 pm, agents observed, via pole camera, Tara CUNNINGHAM arrive at LEONARD's residence on Marsh Road. She was driving a Volkswagen station wagon, bearing Pennsylvania license plate FXZ4483. Pennsylvania DMV records revealed the Volkswagen is registered to Tara DOSSANTOS (an alias for Tara CUNNINGHAM) at 1503 Green St., Apt. 3, Philadelphia, Pennsylvania.

86. On August 24, 2007, at approximately 10:49 pm, LEONARD called LICATA on Leonard Line #3. LEONARD asks LICATA if "he is gonna hang out tomorrow." LICATA told him "Yeah, definitely." LEONARD asks, "How long?" LICATA replies "probably like the last time, I would assume." LEONARD asks "What are you, good just 20?" LICATA says "Something like that, yeah, I'll know better tomorrow once I talk to everybody...." LEONARD says, "Well, figure it out, try and figure it out tonight man 'cause I wanna be able to like, not in the morning, but later that afternoon, maybe send a bunch of money, of money, back up there or something. If I can." Based upon my training and experience, LEONARD was once again expecting

a shipment of fronted marijuana and wanted to pay his supplier for it immediately.

87. After hanging up with LICATA, at approximately 11:02 pm, LEONARD called MARTINO on Leonard Line #3. LEONARD asks MARTINO "So, how long did you want to hang out tomorrow?" MARTINO replies "Uh, let, let me uh. Probably just, so fifty of them." LEONARD says "Fifty though?" MARTINO says "Half a spindle." LEONARD replies "Awesome." Based upon my training and experience, MARTINO requested to be supplied with 50 pounds of marijuana (a "spindle" is often used to mean 100 pounds).

88. The next day, August 25, 2007, at approximately 9:07 am, MARTINO called LEONARD on Leonard Line #3. LEONARD said "home boy called me and he was just getting to Watertown." LEONARD asked MARTINO if he would meet with MONTROY because LEONARD had errands to run. LEONARD said he had to "round up some more money and, like, grab the counter and shit and bring it out there." MARTINO says "Yea, Yea. I can definitely do that."

89. At approximately 9:36 am, agents observed, via pole camera, James KNOX arrive at LEONARD's residence. KNOX was driving a light-colored Isuzu Sport Utility Vehicle bearing New York license plate DHN 4170. New York DMV records revealed the vehicle

is registered to James KNOX, 1101 Bay Rd., Webster, New York. At approximately 9:58 am, KNOX left in his Isuzu and LEONARD left in his Tahoe simultaneously from LEONARD's residence.

90. At approximately 10:21 am, LEONARD received a call from Steven POLITOWSKI on Leonard Line #3. LEONARD said, in sum and substance, that he was going to see the quality of the marijuana soon. POLITOWSKI said he wanted "100" and LEONARD said he may not be able to provide that much.

91. At approximately 10:22 am, LEONARD calls MARTINO on Leonard Line #3. LEONARD tells MARTINO to put the high quality marijuana plants to the side for him. LEONARD says "...definitely do that though cause I'm fucking, am retarded dude. That man I was talking to the whole morning, and he started talking about outdoors. Though, when they came the other day they were just, they were really nice. They were a little leafy, so I ended up selling, fucking like 87 of them, for like they were outdoors. So I completely fucked myself the other day like ridiculously bad. So, I'm, I really need to make some money on these. So, definitely take the junkier ones 'cause I need, just, my one of my buddies from out of town just called, so I definitely need to tax him up the best of ...."

92. Two hours later, at approximately 12:15 pm, agents observed LEONARD's Tahoe and MONTROY's pick-up truck both parked at 5790 Rossier Road, Canandaigua, New York. This address is associated with Carl MARTINO. At approximately 12:23 pm, agents observed MONTROY leave the area of 5790 Rossier Rd. in his pick-up truck. Agents followed him to the Watertown, New York area where agents lost sight of him. Based upon my training and experience, and knowledge of this case, LEONARD chose to have MONTROY drop the marijuana off at 5790 Rossier Road, Canandaigua.

93. At approximately 12:39 pm, LEONARD called POLITOWSKI on Leonard Line #3. LEONARD immediately tells POLITOWSKI "Um, I probably got like eighty or ninety I can do, maybe." They agree on 70. LEONARD says "They look really nice. Their really green and super chrystally. POLITOWSKI says "Oh. Okay. That's killer." LEONARD ask "Do you want me to send my buddy down then?" POLITOWSKI says "Yeah." LEONARD then goes on to say, "...I'll try and get ahold of my buddy to drive, ah, I'll get his ass on the road here in a few hours."

94. At approximately 12:42 pm, LEONARD called LICATA and said he could supply LICATA with "15" or "20" pounds of marijuana. LICATA said he should be able to buy that amount. At approximately 1:04 pm, agents observed MARTINO (driver) and LEONARD arrive at the

Express Mart, state route 332, Canadaigua, New York. At approximately 1:16 pm, agents observed LICATA pull into the Express Mart in his pick-up truck and park next to LEONARD. Express Mart surveillance tapes revealed MARTINO, LEONARD, and LICATA were all present. At approximately 1:45 pm, agents observed both LICATA and LEONARD leave Express Mart.

95. At approximately 1:49 pm, WOODWARD called LEONARD on Leonard Line #3. LEONARD says to WOODWARD, "Do you want to go down to Delaware?" WOODWARD says "Yeah. Whatever. What." LEONARD says "Only I'm only gonna give you four grand though." They argue for a bit over the payment. LEONARD tells him he can use his Tahoe again "for the millionth fucking time." LEONARD also says "I mean dude. I mean you driven all the way to Asheville for five and had to sit there for three days. So figure driving to Delaware and being back tonight is definitely..." WOODWARD ask "and what am I running out there." LEONARD responds "sixty of 'em. I just, dude, I fucked myself so bad the other day. Dude, I need like just a little extra couple of bucks here and there."

96. At approximately 2:57 p.m., LEONARD called POLITOWSKI and said his buddy wasn't going to leave for a couple of hours because the power went out and he had to drive back to the city to seal the bags. LEONARD further stated WOODWARD would have to stay the

night. POLITOWSKI said he could stay at his house. LEONARD told POLITOWSKI he needed the money by 4 o'clock.

97. At approximately 12:15 am, DEA Agents working in Philadelphia, Pennsylvania, were informed of the travel path of WOODWARD based upon the GPS tracker on LEONARD's Chevy Tahoe. At approximately 12:53 am, agents observed WOODWARD pull into Steven POLITOWSKI's residence, 1622 New London Rd., Landenberg, Pennsylvania. At approximately 1:10 am, agents observed that the lights were out at the residence.

98. The next morning, August 26, 2007, at approximately 12:37 pm, LEONARD called WOODWARD on LEONARD line #3. LEONARD asked WOODWARD, "Are you driving?" WOODWARD replied, "Ah yeah, I'm just on my way back, I gotta stop somewhere." LEONARD said, "Cool, what time did you leave at?" WOODWARD replied, "I don't know, a half hour ago, 45 minutes ago."

99. At approximately 1:18 p.m., LEONARD called POLITOWSKI on Leonard line #3. LEONARD asked POLITOWSKI, "Ah shit! Um, I was just wondering what you put in there exactly, just so I ah…just cause my fucking people are bugging me, and I just might have to meet homeboy in ahh, in Syracuse. And I not have time to go through it, just so I have an idea what's in there, so I can

fucking know what I need to throw on top of it." POLITOWSKI replied, "Oh, OK, It's like 182,850 or something." LEONARD said, "OK." POLITOWSKI added, "Ah, one…hold on, let me think. It was like 91 and 1, so that's 182,850."

100. At approximately 1:27 pm, LEONARD called WOODWARD Leonard line #3. LEONARD told WOODWARD, "Not shit, I might actually just have to meet you in the 'Cuse because they already left to come down this way." WOODWARD says , "OK, well you gotta, there's a number and everything all on it so." LEONARD said, "Oh, I know, I, I called him and shit dude, is it all in one big bag?" WOODWARD replied, "Well, there's like a pair of shoes, and then a little box."

101. At approximately 2:26 pm, LEONARD called LICATA on Leonard line #3. LICATA told LEONARD, "I was just getting ready to call you and come over right now, but ah, I'm like, I'm like five bucks short so I, you want me to just bring you something back to make it up." LEONARD replied, "I guess."

102. At approximately 2:43 pm, agents observed, via camera, LICATA arrive at LEONARD's residence. LICATA walked into the residence carrying a large hockey duffel bag. Based upon my training and experience and knowledge of this case, it is believed

that LICATA hadn't quite sold all of the marijuana fronted to him by LEONARD and had to return some of the marijuana to make up for the "5" ($5,000) that he owed.

103. At approximately 4:02 pm, agents observed, via camera, LEONARD and CUNNINGHAM leave LEONARD's residence in CUNNINGHAM's Volkswagen. At approximately 4:12 pm, agents observed LEONARD pull into the Target parking lot, route 96, Victor, New York.

104. At approximately 4:18 pm, agents observed LEONARD walking out of the Target store with a black duffel bag. Target store surveillance tapes, and a copy of the receipt, confirmed that LEONARD bought the bag, and showed agents the precise type of black duffel bag purchased by LEONARD. After leaving the store, surveillance officers followed LEONARD and CUNNINGHAM as they drove towards Syracuse, NY. At approximately 5:17 pm, agents observed LEONARD and CUNNINGHAM arrive at the Carousel Mall, Syracuse, New York. They parked near Macy's Department store. Agents also observed LEONARD's Tahoe (driven by WOODWARD) parked nearby. Agents observed WOODWARD, LEONARD and CUNNINGHAM talking together. Agents further observed LEONARD retrieve a multi-colored, long, thin box from his Tahoe, and then put it in the Volkswagen.

105. Shortly thereafter, WOODWARD drove away out of the parking lot in the Chevy Tahoe. LEONARD and CUNNINGHAM got back in the Volskwagen and drove to another location within the parking lot. Agents then observed LEONARD talk with a Native American male, later identified as Jay WHITECROW, and a Native American female, later identified as Jane Whitecrow. LEONARD parked the Volkswagen nearby and got out carrying a black duffel bag. LEONARD and Jay WHITECROW walked over to a red, Chevrolet Impala, bearing New York license plate CZE 6527. New York DMV records revealed the Impala was registered to Jane Whitecrow, PO Box 425, Rooseveltown, New York. (Jane Whitecrow's actual residence is within the Agwesasne Indian Reservation). LEONARD was then observed placing the black duffel bag in the trunk of the Impala. LEONARD and CUNNINGHAM left in the Volkswagen and Jane and Jay WHITECROW left in the Impala. Agents followed the Impala north on Route 81.

106. At approximately 7:09 pm, the New York State Police pulled the Impala over on Interstate 81 northbound, just south of exit 44 (Watertown). During a subsequent search of the trunk of the vehicle, officers found a black, duffel bag. Upon opening the bag, agents discovered a large quantity of cash. Eventually it was determined that the black duffel bag contained $331,990. The black duffel bag was the precise type of black duffel bag purchased

earlier by LEONARD at the Target Store. The money was seized and the Whitecrow's were released, so as not to jeopardize the ongoing investigation. Based on my training and experience, knowledge of the investigation, intercepted calls, and observations made on surveillance, I believe the money seized from Jay WHITECROW and his sister, Jane, were drug proceeds collected from Jamahl LEONARD. LEONARD received the proceeds from at least two of his customers, Steven POLITOWSKI and Christopher LICATA.

107. On August 27, 2007, at approximately 8:52 a.m., agents observed, via live camera, WOODWARD arrive at LEONARD's residence. Shortly thereafter, LEONARD walked out of the residence carrying a heavily-laden backpack. Both subjects then left the residence and LEONARD was driving.

108. At approximately 9:19 a.m., LEONARD called BUDA on LEONARD line #2. LEONARD told BUDA, "... I'm a, I'm on my way, my buddy, my buddy's probably gonna beat me there though." BUDA replied, "all right, I'll, I'll…" LEONARD said, "All right, just a, just yeah, just throw everything downstairs and I'll be there as soon as I can, I just gotta run by…" BUDA replied, "I'm not there yet, I'm still…"

109. At approximately 9:58 a.m., agents observed MONTROY's pick-up truck parked at BUDA's residence at 3127 Shepherd Road, Williamson, NY. At approximately 10:08 a.m., agents observed LEONARD driving his Tahoe near BUDA's residence. A GPS tracking device confirmed LEONARD arrival at BUDA's residence. By 10:58 a.m., agents performing roving surveillance noted that MONTROY's pick-up was no longer at BUDA's residence.

110. At approximately 1:22 p.m., LEONARD received a call on Leonard Line #3 from an unidentified male (UM), calling from (646) 300-2146. The UM asked LEONARD, "What's good? Man, what's going on, I talked to ah, I talked to our, our, our little buddy." LEONARD asked, "What'd he say." The UM said, "I just told him to fucking sit tight man, you know, like wait, wait till some fucking fog clears up, you know." LEONARD added, "He has been sending me text and blowing me up half the fucking time though." Later in the conversation, LEONARD and the UM talk about expanding distribution to Missouri and Baltimore. Based on my training and experience and knowledge of the investigation, the "little buddy" referred to above is Nathan CANARY. I believe the reference to waiting until the "fog clears up" relates to the fact that the police were involved in the seizure of marijuana from CANARY and the seizure of money from WHITECROW.

111. At approximately 10:47 p.m., CANARY called LEONARD on Leonard Line #3. LEONARD tells CANARY "....I ain't been doing shit. My boys, fucking, he lost some, a bunch of money, just, just fucking yesterday and shit." CANARY says "Oh no!" CANARY asks "What happened? Something bad?" LEONARD says "Oh nothing, nothing terrible. They just stopped somebody with the money on the way home." CANARY later tells LEONARD he wants to buy 50 pounds of marijuana. CANARY also tells LEONARD he owes him $70,000 for the load of marijuana he (CANARY) lost and lawyer fees.

112. On August 28, 2007, security officials at Dick's Sporting Goods informed agents that at approximately 11:32 am, LEONARD purchased five hockey bags from the Dick's store, Webster, New York. Agents were supplied with the video and receipts of the transaction.

113. On August 29, 2007, at approximately 2:12 pm, LEONARD called LICATA on Leonard line #3. LICATA said, "Ahh…I got some people over here right now. Can I swing over to your house?" LEONARD replied, "Ah..…If you haven't understood for the last 15 million fuckin' times, I don't have anything at my house. I don't keep shit there anymore. There's no point in you comin' to my house unless you want to talk and hold hands. I mean, I don't how may fuckin' times I have to tell you the shit ain't at my

motherfuckin' house. But everyday you want to say, I'll come by the house. Yeah. It's not there." LICATA said, "Alright."

114. At approximately 3:05 pm, agents observed LEONARD arrive at LICATA's residence. At approximately 3:08 pm, agents observed LEONARD leave LICATA's residence. At approximately 5:41 pm, agents observed two unidentified males (UM's) leave LICATA's residence carrying a weighted hockey bag. The UM's got into a black, Toyota Camry and were followed to the Auburn, New York area where surveillance was lost. At approximately 9:16 pm, agents observed, via pole camera, LICATA arrive at LEONARD's residence in his pick-up truck. LICATA got out of his truck, carrying a small package, and walked in LEONARD's residence. At approximately 9:24 pm, LICATA walked out of the residence, got in his truck and left. Based on my training and experience, and knowledge of the investigation, LEONARD stresses to LICATA that he no longer keeps his marijuana supply at his house. As a result, LEONARD delivered the marijuana to LICATA. LICATA then sold all or a portion of the marijuana to the unidentified males, and then paid LEONARD later the same evening.

115. On August 30, 2007, at approximately 11:58 am, agents observed, via pole camera, Jason MONTROY arrive at LEONARD's residence. This time MONTROY was driving a Dodge pick-up truck,

bearing New York license plate 31244JX. This vehicle is registered to MONTROY's girlfriend, Nicole Larocque, 60 Little River Rd., Canton, New York. At approximately 1:28 pm, agents observed, via pole camera, MONTROY walk out of LEONARD's residence carrying a duffel bag. MONTROY opened the passenger side door of the Dodge and appeared to put the bag behind the seat. Shortly thereafter, LEONARD walked out of the residence followed by a male later identified as Jeffery RAYBURN. At approximately 1:29 pm, RAYBURN (driver) and MONTROY (passenger) left LEONARD's residence.

116. At approximately 5:42 pm, KNOX called LEONARD on Leonard line #2. KNOX told LEONARD, "That was my buddy on the other line. He's gonna be here around nine o'clock tonight, and ahh..umm..your're more than welcome to be here and ahh check it out, and but, I mean. Wait. He's gonna want to hang out at least couple times—two, three times at least—or he probably won't even fuck with us." LEONARD replied, "not a problem at all, not a problem at all." At approximately 8:00 pm, KNOX called LEONARD again and told him (LEONARD) to be at his (KNOX's) house at around 8:50 pm. At approximately 8:58 pm, agents observed LEONARD pull into the driveway of KNOX's residence. Based on my training and experience and knowledge of the investigation, I believe KNOX has a customer that wants to buy two-three pounds of marijuana from LEONARD.

117. On August 30, 2007, at approximately 10:18 pm, LEONARD received a call from an unidentified male (UM) from phone number (646) 300-2146 (See, ¶ 110). LEONARD told the UM about the money seized from the WHITECROWS. LEONARD states: "Dude, you guys never called me back and I just did never think about it. And fuckin', I had 'em. I got, had like thirteen and a half saved. And then, Yahoos called me the other day and we're like somebody's on the way to grab all the loot. So I sold a ten box. And I don't really have shit left. I wish you would've just called me before you fuckin' left." The UM later asks, "What's he...what did he lose, then?" LEONARD says "I, I didn't tell you? The fuckin' native, lost fuckin' all the money I gave him the other day when he went home?" UM says, "Ahh, that's what happened, huh?" LEONARD says "Yea dude, no, the other, yeah, the other dude, they lost three thirty five." UM says "What?" LEONARD says "yeah, three hundred thirty five grand." Based upon my training and experience, LEONARD's references to "Yahoos" and "Natives" refer to his Native American source.

118. On September 4th, 2007, Sgt. John Colella of the Wayne County Narcotics Enforcement Team applied for a GPS TRACKER DEVICE on a 1998 Ford F-150 XLT pick-up truck, color green, bearing New York State Registration 86520JW and vehicle identification number 2FTZX18WXWCA09579, a vehicle registered to Jason A. MONTROY. The

warrant was signed on September 4th, 2007, by Supreme Court Justice, Acting, Stephen R. Sirkin.

119. On September 5, 2007, at approximately 6:22 pm, LEONARD called MARTINO on LEONARD line #3. At this time, LEONARD was physically located in Philadelphia, PA. MARTINO asked LEONARD what he was doing the next day. LEONARD replied, "Hopefully fucking working." MARTINO said, "Yep." LEONARD asked, "I hope, why, you wanna work?" MARTINO replied, "I think so, I got two pounds now and I can't get a hold of either one of them." LEONARD said, "Cause if you can, try and figure out just because my friend, um, here wants, I can probably, I can probably come up with cash for more than a whole spindle down here so I was almost thinking I, maybe just have him, give him double the money and have him come all the way down here possibly." Later in the conversation, LEONARD told MARTINO, "You can go meet up with homeboy like I got, I guess, I got a little bit of cash at the house, so you can pay him and you can deal with him." MARTINO replied, "alright." Based on my training and experience and knowledge of the investigation, LEONARD would prefer to get MONTROY to come all the way to Philadelphia by giving him "double the money." Alternatively, if he doesn't, LEONARD wants MARTINO to meet MONTROY or his source in the Rochester area to receive a shipment of marijuana and pay him.

120. On September 7, 2007, at approximately 6:39 pm, Francisco FRANCO called LEONARD on Leonard line #3. FRANCO and LEONARD discuss a pending shipment of marijuana LEONARD is expecting. LEONARD told FRANCO, "Well, yeah, well figure out how many you think you may need, and (unintelligible) up this way and fuckin' uh, then give me a call back here this evening, let me know and I'll give you a call back when I figure out if I'm even going to be able to do anything tomorrow. If my fuckin' driver ever calls me back." FRANCO replied, "OK, well, yeah, I'm sure you know like 30,40, probably 50, you know, not too many but, the same kid I hang out with down here, he's up there taking care of some shit." LEONARD said, "Oh, OK." Based on my training and experience, LEONARD asks FRANCO how much marijuana he needs, however, he has to wait on his driver (MONTROY) to call him back. FRANCO says will need 30, 40, or 50 pounds of marijuana.

121. On September 8, 2007, at approximately 8:41 pm, MARTINO called LEONARD on Leonard line #3. LEONARD told MARTINO, "I, oh man, I had all my shit packed, I was walking outside and tried to call the, the old man, I don't know what the old man's doing, he's not ar….I can't get a hold of him but the, the, fuckin' his big (unintelligible) son's trying to take care of everything." MARTINO replied, "right." MARTINO later said, "I can do like uh, three quarters of a spindle when you get home." LEONARD replied, "Oh,

well, also the thing is two now, so we're lookin' for Monday, now. I guess probably and the reason I think uh, they're trying to send two full spindles, too so." MARTINO said, "nice, so we should be good." Based on my training and experience and knowledge of the investigation, LEONARD tells MARTINO he is having problems receiving a shipment of marijuana from his source of supply, whom he refers to as "the old man." MARTINO then tells LEONARD he can buy 75 pounds of marijuana. LEONARD said he is expecting 200 pounds on the next shipment.

122. On September 9, 2007, at approximately 5:41 pm, Tara CUNNINGHAM called LEONARD to see if everything was good. LEONARD, in sums and substance, said everything should be good but that he was going to call "him" when he gets home. LEONARD said he would rather distribute the two spindles in the Rochester area. He said his fat roomate[2] (MARTINO) could take 30 quarters, and another friend could take 105 lbs. He said he would save some for CUNNINGHAM. LEONARD said he could send a whole spindle to you guys down there. Based on my training and experience and knowledge of the investigation, CUNNINGHAM calls LEONARD to inquire about obtaining a shipment of marijuana. LEONARD tells CUNNINGHAM he

[2] Based upon the information learned to date, MARTINO and LEONARD do not actually live together at 594 Marsh Road. However, the phone and utilities for that residence are listed in Carl MARTINO's name.

needs to call his source of supply. LEONARD also says he can distribute 200 pounds in the Rochester area but he will save a whole 100 pounds for "you guys."

123. On September 10th, 2007, at approximately 4:22 AM, the GPS Tracking Device monitoring the movements of Jason MONTROY's pick-up truck, showed the following: Montroy departed his residence at 60 Little River Road, Canton, NY. The vehicle traveled to # 743 Route 37C, in Massena, New York. Intelligence gathered from this and other state and federal investigations have identified this residence as a possible "staging point" for the ultimate source of supply for the Jason Montroy and Jamahl Leonard organizations. MONTROY arrived at this residence at approximately 5:10 AM, and he departed at approximately 5:15 AM, at which time he traveled directly back to his residence, using a different route of travel than he used on his way to #743 Route 37 C. At approximately 6:24 AM, Jason Montroy arrived back at his residence located at 60 Little River Road, Canton, New York. At approximately 7:07 AM, Jason Montroy departed his residence, and based upon GPS tracking data, began traveling south to his ultimate destination that morning, 3127 Shepherd Road, in Williamson, New York.

124. At approximately 8:59 am, LEONARD called WOODWARD on Leonard line #2. LEONARD told WOODWARD, "Steve called me this morning." WOODWARD replied, "Oh, did he?" LEONARD asked, "Yeah, you ready?" WOODWARD replied, "when, when?" LEONARD said, "Today, as soon as we can get it to you." WOODWARD replied, "OK, yeah, um, when do you want me to meet ya?" At approximately 9:52 am, LEONARD called WOODWARD and told him that Terry BUDA was not at his residence yet and for him (WOODWARD) to wait in the driveway. At approximately 10:27am, agents conducting surveillance observed a blue Camaro, driven by WOODWARD, parked at BUDA's residence. At about the same time, agents observed LEONARD's Tahoe parked at Matthew FOX's residence.

125. About 15 minutes later, agents observed LEONARD driving his Chevy Tahoe away from the area of FOX's residence. At approximately 10:41 am, CUNNINGHAM called LEONARD and LEONARD said he was just getting to "work" and told her that homeboy (WOODWARD) would be down there today. CUNNINGHAM asked how everything was looking and LEONARD said he hadn't seen it yet, he was "just about there." LEONARD then states, "I just had to stop and grab some money and shit from my friend." Based upon my knowledge of this case, LEONARD had just obtained a quantity of cash from Matthew FOX.

126. At approximately 11:05 am, agents observed MONTROY's pick-up truck backed in the driveway of BUDA's residence. GPS Tracking showed it had arrived at exactly 10:51 a.m.. Agents then observed LEONARD's Tahoe, along with WOODWARD's blue Camaro, also parked at BUDA's residence. At approximately 11:23 am, LEONARD called BUDA and BUDA said he (BUDA) was picking up cars but that he would be back at his (BUDA's) residence to help them out (this investigation has revealed that BUDA is involved with motor vehicle sales). At approximately 4:40 pm, agents observed WOODWARD driving LEONARD's Tahoe away from BUDA's residence.

127. At approximately 4:42 pm, CUNNINGHAM called LEONARD on Leonard line #3. LEONARD told CUNNINGHAM, "Lots of bad news today." CUNNINGHAM replied, "Why?" LEONARD said, "They're not out, but they are more expensive." CUNNINGHAM asked, "OK, are they nice?" LEONARD replied, "Yes, they're nice enough." LEONARD added, "If you don't, if you don't want 'em, that's fine, I'll make some money on 'em." CUNNINGHAM replied, "Uh, no, I want 'em." LEONARD replied, "Yeah, that's what I thought so." CUNNINGHAM said, "Maybe, but maybe, maybe just, maybe like twenty or twenty-five instead of thirty is OK, because I'd like, I'm gonna be gone and I'd like to just give 'em all to those two retards." Based on my training and experience and knowledge of the investigation, LEONARD is going to send CUNNINGHAM between 20 and 25 pounds of

marijuana.

128. Later that night on September 10, 2007, at approximately 8:35 pm, LEONARD called WOODWARD on Leonard line #2. LEONARD asked WOODWARD, "You just left?" WOODWARD said, "Yeah." WOODWARD added, "Sorry I got such a late jump, man. Fuckin', I had my little man. I couldn't do nothin' about it." LEONARD replied, "No, no, I know. It's alright. Umm, I was just wonderin', I just talked to Steve. Umm..." Based on my training and experience and knowledge of the investigation, WOODWARD was transporting a load of marijuana for LEONARD to CUNNINGHAM and Steve POLITOWSKI in the Philadelphia area.

129. On September 11, 2007, at approximately 2:10 am, assisting DEA agents in Philadelphia, PA observed WOODWARD, driving LEONARD's Tahoe, park in the area of the 1400 block of Green St., Philadelphia, Pennsylvania. Again, Tara CUNNINGHAM lives at 1503 Green St., Philadelphia. The agents then observed WOODWARD remove a large, black duffel bag from the rear of the Tahoe. The agents further observed Tara CUNNINGHAM waiting for WOODWARD on the sidewalk outside 1503 Green Street. Both subjects walked into the apartment building with WOODWARD still carrying the duffel bag.

130. At approximately 2:34 am, agents observed WOODWARD leaving CUNNINGHAM's residence. At approximately 2:38 am, LEONARD sent WOODWARD a text message with POLITOWSKI's phone number. At approximately 3:32 am, agents observed WOODWARD pull into the driveway of POLITOWSKI's residence in Landenberg, PA, a suburb of Philadelphia. WOODWARD stayed at that residence for the remainder of that night.

131. Later that morning, September 11, 2007, at approximately 9:40 am, federal agents continuing surveillance observed POLITOWSKI walk out of his residence carrying a backpack and a full trash bag. He put both objects in his trunk. He was followed to a nearby residence and was seen walking into the residence with the bags. A short time later, he left without the bags. At approximately 1:12 pm, LEONARD called WOODWARD and asked him when he was going to come back. WOODWARD said he could leave immediately but he would be $30,000 short. LEONARD complained that he needed to pay for the stuff immediately so he could get hooked up the next day. LEONARD told WOODWARD to leave immediately. At approximately 1:35 pm, agents observed WOODWARD place a box into LEONARD's Tahoe in the driveway of POLITOWSKI's residence. WOODWARD then left the area.

132. On September 11, 2007, at approximately 1:36 pm, LICATA called LEONARD on Leonard line #3. LICATA asked LEONARD, "Nya, all

right, Um, I don't know man, I'm hopin' we can hang out tomorrow and shit?" LEONARD told LICATA he would be leaving for vacation soon, but added, "Oh, no, no, no, listen, listen, listen I'm gonna set it up so, I'm gonna make it so even if I'm gone, then my fat roommate can do stuff cause like, he's been up there with me before and met like, the natives." Based on my training and experience and knowledge of the investigation, LICATA wants to buy some marijuana from LEONARD. LEONARD tells LICATA he will be leaving on vacation but that his fat roommate, Carl MARTINO, can take care of the business because he has been up to meet the Native American suppliers.

133. On September 11, 2007, at approximately 10:40 pm, FRANCO called LEONARD on Leonard Line #3. LEONARD said he (LEONARD) may send home boy (WOODWARD) down there (North Carolina). LEONARD also told FRANCO that fat boy (MARTINO) was going to be in charge while LEONARD was on vacation. LEONARD said MARTINO could take care of things because it wasn't that difficult.

134. On Wednesday, September 12, 2007, at approximately 12:23 pm, agents observed MARTINO dropping LEONARD off at the Rochester airport so LEONARD could rent a vehicle. LEONARD would later drive to Philadelphia, meeting up with CUNNINGHAM. Both CUNNINGHAM and LEONARD boarded a flight on Thursday September, 13, 2007, that

would eventually take them to Belize, Central America. Based upon the calls that were intercepted while LEONARD was out of the country, it was clear that LEONARD gave MARTINO his Chevy Tahoe and his cell phone, Leonard Line #3.

135. On September 12, 2007, at approximately 10:33 p.m., MARTINO answered LEONARD Line #3 and spoke with FRANCO. They both say its good to hear each other's voice. FRANCO tells MARTINO that he needs to "figure something out before Monday, I need to make some money." MARTINO says, "Yea, hope, hopefully there's, hopefully ah, not tomorrow, the next day." FRANCO says he needs to make sure "thirty days." I believe the reference to "thirty days is thirty pounds of marijuana.

136. On September 16, 2007, at approximately 4:55 p.m., Carl MARTINO receives and incoming call on Leonard Line #3. The call is from Chris LICATA. LICATA asks "...what's up with you?" MARTINO says, "Uh, not much, not much, um just waiting on him, the word, right now." Based upon my training and experience, and my involvement on this case, I believe that MARTINO is trying to make arrangements for marijuana to come into town from the source.

137. On September 17, 2007, at approximately 1:39 pm, agents observed, via live camera, a black, Audi sedan, bearing North

Carolina plate WNC 2705, pull into the driveway of LEONARD's residence. A passenger, later identified Francisco FRANCO, got out of the Audi and walked to the front door. FRANCO knocked on the front door and the garage door and did not make contact with anyone. A short time later, FRANCO drove away in the Audi. .

138. At approximately 2:01 pm, FRANCO called MARTINO on Leonard Line #3, and said he was in Rochester, New York and that he needed to see MARTINO. MARTINO sounded rather desperate on the phone. They agreed to meet later somewhere near the New York State Thruway. At approximately 2:40 pm, agents observed the Audi arrive at the McDonald's parking lot, state routes 21 & 96, Manchester, New York. At approximately 2:52 pm, MARTINO pulled into the McDonald's parking lot in LEONARD's Tahoe and began speaking with FRANCO. LEONARD and FRANCO spent the next four hours together at various locations. FRANCO was accompanied by two other males from North Carolina.

139. At approximately 4:29 pm, CANARY called MARTINO and they spoke of the status of the case involving the Canary's traffic stop (seizure of 75 pounds of marijuana near Batavia, New York). CANARY said the police only took it from him and made him sign a receipt. He further stated the police did not take his phone and according to his lawyer, they could have seized his truck. CANARY

also told MARTINO he made a little bit of money the other day because his friend came through with a large quantity of "Cali" (a type of marijuana). CANARY then talked about a specific sentence he may receive as a result of being stopped with the marijuana. CANARY also told MARTINO he would like to make a little money before they send him away.

140. On Tuesday, September 18, 2007, at approximately 11:31 am, MARTINO called FRANCO using Leonard Line #3. They discussed setting up future deals and mentioned the quantity 200 pounds. They also discussed drivers and the need to be able to deliver the product from New York.

141. On September 18, 2007, at approximately 2:29 pm, MARTINO called LICATA. MARTINO said their buddy may be coming tomorrow. MARTINO said "Yeah, yeah, no, he'd, he definitely said he's, he's headed to the other side for a minute." LICATA says "He's coming tonight, you said?" MARTINO says, "No, no. He said he paid it on the other side. He's tryin' to get it all over to send down so everybody's happy." He continued, "So, but hopefully tomorrow my buddy's here." LICATA answers, "All right. That'd be awesome." LICATA further states that he wants to "hang out for a really long time." MARTINO asks, "a full spindle?" To which LICATA replies "hopefully, yeah." Based upon my training and experience, and my

involvement in this case, the reference to "the other side" is Canada. MARTINO said that the source paid for it in Canada, and that he was trying to get it all over the border into the United States so that it could be further distributed.

142. On September 18, 2007, at approximately 5:15 p.m., Carl MARTINO receives an incoming call from WOODWARD on Leonard Line #3. MARTINO tells WOODWARD "Ummm, you're on call for tomorrow." MARTINO says it "sounds like tomorrow morning." Based upon my training and experience and my involvement in this case, I believed that MARTINO is expecting a shipment of marijuana and that he wants WOODWARD available to transport it to customers out of state.

143. On September 19, 2007, at approximately 11:07 am, MARTINO called WOODWARD. In sum and substance, MARTINO tells WOODWARD that the supplier told the delivery guy (MONTROY) that they were not going to bring any marijuana down until LEONARD returned from vacation. Specifically, MARTINO says "Dude, nothing good dude. These motherfuckers call, tell me they're comin', then have the fucking kid that cruises call me, and tell me they're not coming down until home boy gets back."

144. Later that evening, at 6:35 p.m., MARTINO calls FRANCO and advises him of the same information. LEONARD returns from Belize on September 25, 2007.

145. On October 1, 2007, at approximately 4:53 pm, FRANCO called LEONARD on Leonard line #3. LEONARD told FRANCO, "But uh, I don't know, I talked to my boy yesterday and I guess they lost another big ass chunk of money in Canada the other day, so he's actin' like a little fuckin' bitch boy, and wants me to bring money for 50 up, and then he said he'll throw 50 on with mine, and send down a 100. But he wants me to come up and throw down on 50 so, I guess I'm a have to fuckin' do it cause I have not other fuckin' choice man. I just spent the last little bit of fuckin' money I goddamn got. And hope to god it fuckin' goes right." LEONARD told FRANCO he had to put more minutes on his phone. FRANCO replied, "alright." Based on my training and experience and knowledge of the investigation, LEONARD needs to pay his source of supply for 50 pounds of marijuana up front, and the source of supply will front him an additional 50 pounds, meaning the shipment will total 100 pounds.

146. On October 2, 2007, at approximately 11:38 a.m., agents observed, via live surveillance camera, a red GMC pick-up truck, bearing New York license plate DJJ 2266, arrive at LEONARD's

residence. The GMC was being driven by Jeffrey RAYBURN. Jeffrey RAYBURN had previously been observed with Jason MONTROY at 594 Marsh Road on August 30, 2007 (See, ¶ 115). RAYBURN walked into LEONARD's residence. New York DMV records reveal that the GMC pick up truck is in fact registered to one Jeffrey RAYBURN, 7276 County Rd. 27, Canton, New York.

147. Two minutes after going into the residence, agents observed, via live camera, RAYBURN walk out of LEONARD's residence. RAYBURN was carrying a white, paper bag. Surveillance officers began trailing RAYBURN's car as it entered the NYS Thruway, heading east towards Syracuse.

148. At approximately 12:30 p.m., New York State Troopers stopped RAYBURN's vehicle on the Thruway, just east of the Weedsport exit. Troopers stopped RAYBURN for speeding and failure to signal a lane change. During a consent search of the vehicle, agents located the white paper bag. It contained exactly $75,000 U.S. Currency. During a search of the numbers in RAYBURN's cellular phone, he had the cellular phone number for Jason MONTROY - (347) 707-0383.

149. Following the seizure of the money, RAYBURN made a statement, part of that statement is as follows: "The trooper

searched my vehicle and found money located behind the passenger seat. I have no idea where that money came from or how much was there. The vehicle is mine and I'm usually the one that drives it."

150. Later that night, at approximately 9:29 p.m., FRANCO called LEONARD on Leonard Line #3. LEONARD gives FRANCO the bad news. FRANCO asked, "What's up?" LEONARD replied, "Nothin' fucking good at all." FRANCO says "What's goin' on?" LEONARD says "Nothin' fuckin' good at all man. I don't even want to talk about it on the fuckin' line. I may be usin' another line to talk to you on." LEONARD continues "I said I need to get a new line to talk to you on. I'm fuckin', nothin' good at all today man. I lost pretty much everything I have left. Today ain't been the best of days."

151. LEONARD then goes on to explain what happened: "You know, I try and save like a hund...you know, put a hundred somewhere man and just fucking pretend it doesn't exist." "Yeah, in case, God forbid someone, you know what I mean, somebody needs some bail money or fuckin' shit little money for a lawyer or whatever you know? I fuckin' threw it up today so I could fuckin' try and get somethin' done, cause it seems like the only way it's gettin' done. And the fuckin' kid got stopped on his way back up there today and I got taken. So now I'm just fuckin' assed the fuck out....".

**MONEY LAUNDERING ACTIVITIES INVOLVING KNOX & LEONARD**

152. KNOX and LEONARD own a business called KNOX-LEONARD PROPERTIES, LLC. There is little question that KNOX knows that LEONARD's source of income is selling marijuana. Not only has he purchased marijuana for he and his friend, there were several calls indicating that KNOX knew LEONARD was doing interstate sales. For example, on August 3, 2007, James KNOX called LEONARD and LEONARD told KNOX he (LEONARD) had to rent a car because he let WOODWARD drive his Tahoe to North Carolina. KNOX told LEONARD that the trip to North Carolina was "money in the making."

153. On August 6, 2007, at approximately 1:28 pm, LEONARD called KNOX on Leonard line #1. KNOX and LEONARD discussed purchasing a house. KNOX told LEONARD, "This house over of Frey Street, we got him down to $53,000 and no closing cost, the house is assessed at eighty should be able to sell it in a couple months for eighty bucks, we take a couple weeks and fix it up probably around I'm thinking around a eight thousand dollars in cash to fix it up and ah, he'll take $20,000 down, and he'll hold the mortgage himself at eight and a half percent interest for six months so whatever comes first we pay it off in six months or or you now we can either wait and pay it off whatever it its, the eight thousand dollars a months or we can ah hopefully it will be sold by the time the six months is up." LEONARD replied, "OK."

154. KNOX said, "What do you think, it's something we should do or what?" LEONARD replied, "What it, it's $8,000 a month though." KNOX replied, "huh." LEONARD said, "How are we going to show that we got $8,000 a month, to throw into it." KNOX said, "This is all on the D-L" (down low). LEONARD replied, "oh, oh, oh, nobody will know." KNOX said, "No, nobody will know, the guy I am buying the house from is holding the note." LEONARD said, "Oh, OK, yeah, I guess we could do that." KNOX said, "A bank's not doing it, the guy is, I'm figuring we should have this thing sold within two months, you know what I mean, I'm figuring maybe pay one $8,000 am month mortgage payment, he, and he'll take $20,000 cash down." LEONARD replied, "Oh nice." KNOX said, "So you know he ain't showing it either, you know what I'm saying." LEONARD replied, "yes." KNOX said, "So that's what I'm saying, so we got nothing to worry about with these daygos." LEONARD replied, "OK.".

155. On August 6, 2007, at approximately 6:28 pm, KNOX called LEONARD on Leonard line #1. They discussed the down payment on the residence. KNOX said to LEONARD, "I'm thinking, I'm thinking, you write a check from your savings account, I'll write some out of the business account for half of it, for half the down payment, and then we'll give 'em the other down payment. The other half, it, because after, as long as you stay under that 10 mark nobody, you know what I'm saying." LEONARD replied, "yeah." KNOX and LEONARD then began to discuss the taxes on the property. KNOX

said, "Um, Um, how taxes are gonna be, OK, we don't gotta pay any huge amount of taxes, if we leave it in the business account, we pay nothing on it, as long as it's in there, but as soon as it gets taken out under one or my your names, what, whoever takes it out has to pay the taxes on it." LEONARD replied, "OK." KNOX added, "you understand that, so you'll, I mean say we bought this house and we split it 50-50, you took $40,000, so that means this year you've made $40,000 already." LEONARD replied, "OK." KNOX said, "So you'd have to pay that and plus whatever we made doing our remodeling business." LEONARD replied, "OK."

156. Based on my training and experience and my involvement in this investigation, in the foregoing telephone conversations, I believe KNOX and LEONARD discussed the purchase of a house and structuring the down payment for the house. During the conversation, they also mentioned staying under the "10" mark, they are talking about staying under $10,000. Any transactions conducted over $10,000 require special paperwork to be filed with the Internal Revenue Service. Furthermore, agents believe KNOX and LEONARD are attempting to launder drug money by purchasing real estate.

157. On August 8, 2007, KNOX called LEONARD on Leonard line #1. KNOX told LEONARD they had to make a payment of $9,000 and they will hold the residence until closing. Regarding the remainder of the down payment, KNOX said they can make out a

cashier's check for $10,000, and then, "We can do the other nine the other way and that way nothing's over ten, and the ten that we do is in a check and accounted for and no problems whatsoever."

158. On August 16, 2007, KNOX calls LEONARD and tells him, in sums and substance, that they have until August 30, 2007 to come up with the money. KNOX says to LEONARD "...you got ten grand in your savings account or checking account, right?" KNOX says he'll make up the difference from the business account, and then they will have to "make up the difference periodically through the week. Walter said the best way to do it or Bob said the best way to do it is to do like thirty five, thirty five or whatever it is and then he's going to claim our cash jobs that we did." As stated above, any monies deposited by LEONARD are illegitmate.

159. On August, 17, 2007, KNOX called LEONARD on Leonard line #2. KNOX told LEONARD they had to do payroll today. KNOX told LEONARD they didn't have to meet with the attorney until Monday giving LEONARD the weekend to work. KNOX told LEONARD to give him (KNOX) $1,100 and then KNOX can give him his payroll check. The reference to "work" is dealing marijuana, because LEONARD has no legitimate employment. It appears as though they are using the LLC to act as a legitimate front, actually cutting paychecks back to LEONARD.

160. On August 20, 2007, at approximately 1:06 pm, KNOX

called LEONARD on Leonard line #2. LEONARD told KNOX he has a friend that is dropping off money so they will have some money to make a down payment on the house they are trying to buy.

161. On August 31, 2007, based on Monroe County Clerk's Office records, KNOX-LEONARD PROPERTIES, LLC, purchased 95 Frey St., Rochester, New York, for $53,000. It appears $28,000 was put down as a down payment for the property.

**CONCLUSION**

WHEREFORE, based upon the foregoing, I respectfully submit that there is probable cause to believe that from in or about February 2007 to the present, in the Western District of New York and elsewhere, defendants JAMAHL LEONARD, CHRISTOPHER LICATA, CARL MARTINO, JASON MONTROY, STEVEN POLITOWSKI, DANIEL WOODWARD, JAY WHITECROW, TERRY BUDA, MICHAEL BURTON, NATHAN CANARY, TARA CUNNINGHAM, AKA: Tara Dossantos, LEVAR FANIEL, MATTHEW FOX, FRANCISCO FRANCO, JEFFREY RAYBURN, and JAMES KNOX, with violations of Title 21, United States Code, Sections 846 (conspiracy to possess with intent to distribute and to distribute 100 or more kilograms of marijuana); 841(a)(1) and (b)(1)(B) (possession with intent to distribute and distribution of 100 kilograms of

marijuana); and charging KNOX and LEONARD with Title 18, United States Code, Sections 1956 (h) (money laundering).

William Reichard

**WILLIAM REICHARD**
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me this 9
day of October, 2007

Marian W Payson
HON. MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE